# Exhibit A

# COMMONWEALTH OF VIRGINIA



LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG VA 20178-0550
(703) 777-0270

Summons

To: ROBERT FALCONI ESQ
(SPECIAL PROCESS SERVER)
21000 EDUCATION COURT
ASHBURN VA 20148

Case No. 107CL22001958-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, May 06, 2022

Clerk of Court: GARY M CLEMENS

by _Brittany Rolen_
(CLERK/DEPUTY CLERK)

Instructions:

Hearing Official:

Attorney's name: QUENTIN R CORRIE
703-273-7000
4031 CHAIN BRIDGE RD, STE 301
FAIRFAX VA 22030

**VIRGINIA:**

IN THE CIRCUIT COURT OF LOUDOUN COUNTY

P.G., a minor, by and through K.G.,
as parent and next friend

    Plaintiffs,

v.

LOUDOUN COUNTY SCHOOL BOARD,
Serve: Leo Rogers
      County Attorney
      1 Harrison Street, SE
      Leesburg, Virginia 20175

    Defendant.

FILED
2022 APR 11 PM 1:37
CIRCUIT COURT
CLERKS OFFICE
LOUDOUN COUNTY, VA
TESTE:_____D.C.

At Law No. CL22-1958

## COMPLAINT/APPEAL FROM ADMINISTRATIVE HEARING

COME NOW, your plaintiffs, by their counsel and file their complaint and in support thereof state as follows:

### I. JURISDICTION

The subject matter jurisdiction of this Court is invoked pursuant to the 14th Amendment to the United States Constitution, 28 U.S.C. § 1331; and 42 U.S.C. §1983, §504 of the Rehabilitation Act of 1973; 42 U.S.C. § 2000d; and 20 U.S.C. 1415(i)(2)(A). This is an appeal from Decision G. v. Loudoun County Public Schools 22-020, G. v. VDOE 22-021, dated October 25, 2021.

### II. PARTIES

1) P.G. ("PG") is an African-American, minor child.

2) K.G. ("KG") is PG's father and next friend. During all times relevant herein PG has been a student attending Loudoun County Public Schools.

3) Loudoun County School Board ("LCSB") is the Local Education Agency (LEA) and was at all times relevant herein where PG was placed for educational purposes by his parents.

## III. FACTUAL BACKGROUND

4) On July 17, 2018, an eligibility committee determined that P.G. did not meet the criteria for an IEP under the IDEA despite that the committee was given a report by Dr. Federici, a board-certified neuropsychologist and psychopharmacologist who had diagnosed PG with having mild dyslexic disorder; dysgraphia along with poor written expression, grammar punctuation and spelling causing his writing to be almost illegible and significantly below grade level.

5) The report also diagnosed PG with having weaknesses and deficits and difficulties with his auditory and visual areas and required specialized instruction. The report also recommended a functional behavioral assessment ("FBA") which would allow for a deeper, in-depth understanding of what triggers behind his negative behavior which would greatly benefit his teachers and his parents through de-escalation strategies to allow him to calm himself and work through a problem without him engaging in responsive negative behavior.

6) It was also recommended that PG be provided with a behavioral intervention plan (BIP) which would allow for an intervention strategy that would help PG overcome those behavioral areas that negatively affected his ability to access the general education curriculum as well and his social functioning.

7) Dr. Federici also determined that when PG was in the 2nd grade, he was showing signs in his writing that he had dysgraphia and that his reading comprehension was highly dependent on good visual organization. He also opined that PG also had an attention disorder which is also coexisting.

8) Dr. Federici also opined that PG was having difficulty accessing his curriculum and that he was visually disorganized or overwhelmed when there's too much visual stimuli, which also

2

flows over in his writing. He further opined that seeing and organizing also slowed PG from keeping up with his curriculum.

9) Dr. Federici's first diagnostic impression was unspecified attention deficit disorder secondary, to another neuropsychological condition, his visual perceptual disorder and that these problems would be with PG for the rest of his life and that he needed modification and interventions.

10) In his testimony at a due process hearing which was held on March 23-26, 2021 involving PG, Doctor Federici testified that he was confident with his diagnostic impression "to a 99.9 percent psychological and neuropsychological certainty". He also opined that if there was no intervention for PG that his conditions "will be persistent and increase as the academic demands increase that even with interventions, they will still be a struggle for him.

11) Doctor Federici also testified that had the interventions which he recommended in his 2018 report had been implemented for PG this would have definitely helped him access his curriculum and be more productive.

12) Despite this information and recommendations, the committee determined that PG did not require special education but instead placed him in a Section 504 plan, which was neither structured to address his disabilities, nor was the 504 plan effectively monitored and executed, notwithstanding repeated and continued complaints by PG's parents.

13) . The defendant also failed and refused to give PG an FBA or a BIP during his entire enrollment although it was recommended by Doctor Federici in his report and which he repeated in his testimony at the due process hearing.

14) Although PG would also have benefited from a collaborative co-taught classroom which includes a general education teacher as well a teacher with special education endorsements on his

or her teaching license. In fact, despite PG's disabilities, he was never provided a teacher with a special education endorsement which has severely undermined his academic progress.

15) During his entire enrollment in defendant's schools, PG would display a "shut down reaction to scenarios wherein he became frustrated especially when he was unable to access his curriculum.

16) Although the defendant knew that PG needed academic intervention (which is time sensitive to the immediate and should not be delayed or denied), this accommodation was also never provided for him.

17) Because PG's past and current teachers did not have special education endorsements and the training or experience PG was never screened or, monitored so that he could receive, specialized instruction that would meet his unique disability-based needs. As a result, PG has been and continues to be denied FAPE.

18) PG's situation has been greatly exacerbated because of the onset of the COVID pandemic.

19) In order to cover up for the denial of fundamental specialized instruction accommodations that would allow PG to adequately access his curriculum, PG's teachers gave him test scores and grades which he did not legitimately earn to bolster the claim that PG was doing well academically and therefore he did not need an IEP with those grossly inflated grades and test scores.

20) In a due process hearing involving PG on March 23, 2021, the Hearing Officer qualified Debra A. Tisler as "an expert witness in the area of special education with the subsets of eligibility, adequacy of 504 services and FAPE regarding services".

21) When Ms. Tisler was asked whether there was anything in PG's record that would support the good grades he was given by his teachers, she testified that there was nothing to support these good grades.

22) When she was asked whether the "outstanding" grades that he received were consistent or inconsistent, she testified that they were inconsistent because they did not even comport with the current progress report of his completed assignments.

23) Ms. Tisler also testified that there were several areas where PG needed improvement, but there was no indication by his teachers that he needed improvement.

24) This testimony indicates that PG was given pretextual grades and inflated test scores.

25) PG's father was also a witness at that that same hearing and testified that the grade reflected on his child's 4th grade report card was inconsistent and that in order to create that consistency one had to look at his work samples and assessments that were utilized by the teacher as well as the data points inclusive of a valid and reliable curriculum-based assessment.

26) He also testified that he did not see anything in PG's record that suggests that he was capable of earning B's which were the grades he was given by his teachers.

27) He also testified that he felt that his son's grades were inflated beyond what he had achieved.

28) During the due process hearing, employees of the defendant testified under oath that Doctor Federici did not diagnose PG as having dyslexia, despite that that was his diagnosis contained in his report which was available to these employees.

29) On September 20, 2019, during a hearing on a motion to dismiss in the United States District Court in Alexandria, Virginia the following colloquy took place:

> THE COURT: Okay. Thank you. Is he dyslexic?
> MS. GREENHILL: Yes.

5

> THE COURT: That's been diagnosed?
>
> MS. GREENHILL: Yes.
>
> THE COURT: Is that part of this administrative record?
>
> MR. GREENHILL: It is all in the record.
>
> MS. GREENHILL: It is in the neuropsychiatric evaluation done by Dr. Federici.
>
> THE COURT: Is that right?
>
> MR. BALLUM [Counsel for defendant] **Your Honor, I do not recall if there was a specific diagnosis of dyslexia by Dr. Federici. I do know that the IDEA eligibility team determined that the child was not a student with a specific learning disability.**
>
> THE COURT: Because if he were dyslexic, he would clearly be eligible for certain special ed.
>
> MR. BALLUM: He is receiving special ed accommodations under Section 504. Again, there is a different eligibility standard, Your Honor, under Section 504 and the IDEA.
>
> THE COURT: **Does the school believe he is dyslexic, if you know?...**
>
> MR. BALLUM: **No, Your Honor.**
>
> MR. BALLUM: **No, Your Honor. He was not found eligible as a student with a specific learning disability.** Under the IDEA, dyslexia is not its own separate criteria. It would be a student eligible under a specific learning disability in the area of reading most likely. And the student was not found eligible under that category, no, sir. He is eligible under a Section 504 plan as a result of an ADHD diagnosis....

(Exhibit 1, Pages 12-14) (Emphasis Added)

A few minutes later the Court added:

> THE COURT: ...For example, dyslexia, if that's a real problem, the child has dyslexia, I can't imagine the school not being very interested in making sure that either exists or doesn't exist, and if it exists, to find a way to address it and to help the child. That's what schools do. That's what teachers do.

(Exhibit 1, Page 16)

## IV.   MARCH 23-26 2021 DUE PROCESS HEARING

6

30) On March 23-26, 2021, a four-day due process hearing was held due to the refusal of the defendant to find PG eligible for an IEP.

31) A principal witness who testified in that hearing was Doctor Federici who affirmed his earlier report on PG in which he diagnosed him with having several disabilities which prevented him from adequately accessing his curriculum and performing at grade level. Doctor Federici's report was introduced into evidence at that hearing.

32) The hearing officer in that case, is the same as in the later hearing, rejected Doctor Federici's testimony and report stating in his decision:

> The Doctor was designated an expert in neuropsychology. (HT25Volume1 at 243.) Overall, his testimony was consistent with the Doctor's Report. He evaluated the Child in 2018, three years earlier while the Child was in second grade (as opposed to his current fifth grade).(HT Volume1 at 243-244 and 309.) The Doctor opined that "interventions" were required to allow the Child access to this curriculum. (HT Volume1 at 259-280.) On cross-examination, the Doctor did not have the exhibits before him by his own decision. (HTVolume1 at 276-277.) This was because he was contacted to appear as a witness, for the first time, two days before his appearance and was very busy at his work. (HT Volume I at 281.) All documents with the exception of the Report were irrelevant to him. (HTVolume 1 at 285-286.) He never observed the Child in the classroom. (HTVolume 1 at 289.) While the Doctor's opinions were exactly the type of information to allow a Due Process matter be adjudicated, his testimony was extremely discounted: he has not evaluated the Child in 2021 and his three-year old evaluations are, at best, outdated bordering on irrelevant; the Child was not medicated, i.e., medicated with Ritalin, at the time of his evaluations in 2018, as described in the Report; his general opinions regarding "interventions" was not tied to the Child's current situation, academic or otherwise. His testimony did not address the Report's indication that, in terms of reading, the Child did no exhibit a "Dyslexic Disorder." His demeanor was that of a professional who wanted to help but, given the circumstances, was restrained by his outdated participation. His opinions were given little, if any, weight.

(Decision, pp. 14-15)

### V.   SEPTEMBER 17, 2021 DUE PROCESS HEARING

7

33) A due process hearing was held on September 17, 2021 in which Mr. Hartsoe was again the Hearing Officer.

34) This hearing was held to determine whether PG was entitled to an Independent Educational Evaluation (IEE).

35) The Hearing Officer ruled, "The overwhelming evidence is that the LEA conducted IDEA evaluations in 2018". (Decision, p.8)

36) Although the Hearing Officer referenced "prior Hearing Officer decisions" he failed to acknowledge in his decision that that he refused to consider as relevant Doctor Federici's report and his testimony because he had not evaluated PG in 2021 and his early evaluation was dated and therefore "bordered on the irrelevant".

37) Given that the request for the IEE was to update Doctor Federici's 2018 report and evaluation of PG and was in response to the decision in 2021 that this report was outdated, the denial of the request for an IEE was clearly erroneous; was not supported by the law or the evidence; and was therefore was not regularly made.

## VI. ALLEGATIONS OF RACISM IN LOUDOUN CTY. SCHOOLS

38) In September 2020, the Loudoun Branch of the NAACP announced that it was pressing for a resolution from the Virginia Office of the Attorney General in its racial discrimination investigation into Loudoun County Public Schools following a year-long investigation by the Virginia Division of Human Rights.

39) The investigation was launched because over 200 students and parents cited racist incidents.

40) Human Rights Division was investigating elite Academies of Loudoun; criteria to evaluate students and how it is established; and, information about planned or implemented responses to the findings listed in an independent equity assessment.

8

41) In a report from Loudoun public Schools, in the 2018 school year, 2,116 students applied for the Academy of Science and Academy of Engineering and Technology, including 65 Black students which was based on a report from the schools.

42) The report reveals that only one Black student was accepted along with two American Indian and Pacific Islander students. Asian (353) and white (104) students made up the top two ethnicity groups accepted.

43) PG's parents have consistently complained to officials of the defendant to concerns that PG was the victim of disparate treatment because of his race.

44) Upon information and belief, PG's parents have long believed that White students who have been diagnosed as dyslexic and having other health impairments have routinely been granted eligibility for IEP's and specialized educational treatment.

45) On January 30, 2020, the Special Education Supervisor of Reading and Math in The Office of LCPS (hereinafter "Supervisor") assisted by a Specialized Instructional Facilitator in Reading presented a live and video seminar under the auspices of the Parent Resource Services of LCPS entitled "A Comprehensive View of How LCPS "Says", Addresses and Explains Services for Students with Dyslexia." A number of the slides reflect, focus and presuppose dyslexic children having an IEP, and then pose variations of details within the IEP for the dyslexic child.

46) PG's father attended that presentation and was led to believe from it that it would result in an IEP for PG.

47) A due process hearing entitles parents and school officials to one that is impartial. 20 U.S.C. 20 U.S.C. §1415 (b)(2).

48) The due process hearing from which this appeal arises was the result of partiality and unfairness presented by defense counsel and adopted by the administrative hearing officer, who heard the extant due process hearing and the prior due process hearing. The hearing officer's written statements in his decision raised by defense counsel's questions reflect both of their bias toward persons representing and testifying for PG, which in turn reflects their bias against PG and his right to but denial of an IEP, FAPE and an impartial hearing. The actions of the Defendant through its policies, patterns, practices and customs caused PG's injuries.

49) On or about March 9, 2022 after six years of working for LCPS, the "Supervisor" tendered her resignation from that position effective June 30, 2022 in which she stated was because of the "misalignment with many of the actions I observed and experienced over the course of the past six years in Loudoun County Public Schools."

50) Supervisor set forth in her letter of resignation the following examples of "discrepancies I have personally witnessed and experienced":

a) "Failure to systemically implement scientifically based literacy instruction across all tiers of instruction and in all schools, perpetuating a trend of lowered literacy rates among our minority and at-risk populations.

b) She further claimed that the defendant failed to widely implement and make available reading instructions to "at-risk students… in favor of balanced literacy approaches, which continue in implementation today, despite the external review proving their ineffectiveness".

c) She also pointed out in her resignation letter that there was a "clear pattern whereas children whose parents have paid for attorneys, advocates, private evaluations and tutors attain publicly funded services above and beyond that which are provided to students who have similar

10

or greater educational needs, yet whose parents cannot afford such means of attaining those services".

d)     She also complained that staff were encouraged "to predetermine IEP placement based on a student's category of special education eligibility, and/or utilize lengthy and self-imposed LRE protocols instead of allowing IEP teams to make authentic decisions based upon the needs of the individual student and in accordance with federal and state regulations governing special education".

e)     She concluded that she could not "in good faith retain my professional values and simultaneously choose to be aligned with an organization in which I have witnessed and experienced these occurrences".

## VII.   IMPACTS, AFFECTS AND EFFECTS ON PG

51)    Doctor Federici was asked what would be the impact on PG if the recommendations that he made were not carried out.

52)    He first said that without intervention, PG would not get better but would get worse and that early intervention was preferable.

53)    Doctor Federici also testified in the due process hearing that had the interventions been used for Preston in 2018 this would have definitely helped him access his curriculum and be more productive.

54)    Despite Doctor Federici's extensive involvement with PG, the defendants never contacted him.

55)    The defendant has cheated PG from his childhood learning by failing and refusing to determine him eligible under the IDEA by not providing him with a meaningful and competent IEP or any of the other suggested recommendations made by Doctor Federici in his 2018 report.

56) As a direct and proximate result, PG continues to regress and his disabilities are continuing to keep him from accessing his curriculum and thus he continues to be denied FAPE.

57) PG's writing remains virtually illegible which causes him great anxiety and he now is several grade levels below where he should and could have been had the interventions that Doctor Federici recommended been implemented with fidelity.

58) Upon information and belief, white children similarly situated to PG who have manifested less acute symptoms of that disabilities are routinely found eligible for IDEA services and accommodations.

59) Upon information and belief, staff in the Offices of Special Education according to Supervisor have voiced numerous concerns of a failure by LCPS to mitigate its reports of unethical behavior including the suppression of staff to speak out regarding activities in the Office of Special Education, which the Supervisor, reported to the LCPS Superintendent, who has not only failed to act to correct the situation, but also has resulted in further suppression.

60) The Initial Report of the Equity Collaborative submitted on June 6, 2019, clearly shows significant achievement disparities in LCPS between general education students and students with disabilities. While graduation total percentages between these two groups are close, students with disabilities are far behind in every other category and are even further behind in black and Latinx categories.

61) Ironically in September 2020 the LCSB and the Administration of LCPS, among others, apologized publically in writing to the black community of Loudoun County for the negative impact, damage, and disadvantages to Black students and families that were caused by decisions made by the Loudoun County School Board, LCPS Administration and the Loudoun County Board of Supervisors, stating Black people were denied rights and equal treatment.

62) Accordingly, the aforementioned entities promised demonstrable policy changes as outlined in both the Comprehensive Equity Plan and Action Plan to Combat Systemic Racism and agreed to do so with a "strong sense of urgency."

63) Rather than follow through with action, these entities have followed a path of "lip service" and, indeed, in various cases, some outlined hereinabove, have followed plans of further suppression of implementation and a hostile environment to defeat the recommended changes.

**WHEREFORE**, Plaintiffs respectfully requests that this Court rule:

a. That, the decision in October 2021 was not regularly made and therefore should be reversed that ruling as set forth in this Complaint and that this Court enter a finding that FCPS denied PG a free appropriate public education for the appropriate school years;

b. Issue an ORDER for equitable relief and declaratory judgment, stating that the HO's analysis and decision contained mistakes of law that were flawed and clearly erroneous,

c. Issue an ORDER for equitable relief, declaratory judgment, and legal monetary damages consistent with the invoices submitted by Petitioner.

d. ORDER Defendant to provide compensatory educational service to compensate the child for its failure to provide a FAPE, and

e. Awarded plaintiffs the sum of $3,000,000 in compensatory damages and; $350,000 in punitive damages.

f. Grant reasonable attorneys' fees and costs, and

g. ORDER such other, further relief, and permissible damages as the nature of this case justifies and requires.

Respectfully submitted,

PG, by and through K.G.,
as parent and next friend

13

By _____
                Counsel

Quentin R. Corrie
Banks & Associates
4031 Chain Bridge Road, Suite 301
Fairfax, VA 22030
703-273-7000
703-878-7171 (fax)
qcorrie@clbanks.net

**TRIAL BY JURY IS DEMANDED**

14